IN THE COURT OF CRIMINAL APPEALS
OF TEXAS
 


NO. WR-64,302-02




EX PARTE OBIE D. WEATHERS, III, Applicant




ON APPLICATION FOR A WRIT OF HABEAS CORPUS
IN CAUSE NO. 2000-CR-2916 FROM THE
399TH DISTRICT COURT OF BEXAR COUNTY



           Price, J., filed a concurring statement in which Johnson, J., joined. 

CONCURRING STATEMENT
           This is another subsequent post-conviction application for writ of habeas corpus that
presents a “close question” with respect to whether the applicant has established an Atkins
claim of mental retardation by a preponderance of the evidence.


 In the context of post-conviction applications for writ of habeas corpus, the convicting court is the “original” fact-finder (if only because this Court has no capacity for factual development), and we will
ordinarily defer to that court’s findings of fact and conclusions of law when supported by the
record.


 But that deference is not boundless, and we do not simply rubber-stamp the
convicting court’s recommendations. After all, we are the court of return in capital post-conviction habeas corpus proceedings.


 In that capacity, we are the “ultimate” fact-finder,
with the prerogative to reject the convicting court’s recommendations when we deem it
appropriate, even when they are supported by the record, if we think another disposition is
manifestly better supported by the record.


 In my view, this would be such a case except for
one thing—the applicant failed to raise his Atkins claim in his initial post-conviction
application for writ of habeas corpus which was filed after Atkins was decided.
           The applicant ordinarily has the burden to establish an Atkins claim only by a
preponderance of the evidence.


 To establish mental retardation, the applicant must
demonstrate that he suffers from (1) significant sub-average general intellectual functioning,
usually evidenced by an I.Q. score below 70, that is accompanied by (2) related limitations
in adaptive functioning, (3) the onset of which occurred prior to the age of eighteen.


 
Because the applicant failed to raise his Atkins claim in his first writ application, however,
he must now establish, by clear and convincing evidence, that no rational fact-finder would
fail to find him mentally retarded.


 The convicting court’s recommended conclusions of law
erroneously applied the preponderance standard. Because the convicting court recommended
that we conclude that the applicant did not even satisfy the preponderance standard, that error
is ultimately inconsequential. While I disagree that the applicant failed to prove mental
retardation by a preponderance of the evidence, I agree that relief is not appropriate in this
subsequent writ application because he has not shown by clear and convincing evidence that
no rational fact-finder would fail to find him mentally retarded on the facts presented.
           After we granted him permission to pursue his Atkins claim in a subsequent post-conviction writ application, the applicant presented testimony from Dr. Joanne Murphey, a
double doctorate in school and clinical psychology who has administered more than a
thousand I.Q. tests during her career. Murphey first attempted to conduct I.Q. testing for the
applicant on May 1, 2011, obtaining a full-scale score of 53 on the Wechsler Adult
Intelligence Scale, Fourth Edition (WAIS-IV). Because the applicant was exhibiting
“tangential” and “psychotic-like thought processes” during her administration of the WAIS-IV, however, Murphey believed that this initial testing did not represent “a good measure of
[the applicant’s] intellectual functioning.” So Murphey returned three months later, after the
applicant had been medicated. This time she administered the Stanford-Binet Intelligence
Test, Fifth Edition, obtaining what she regarded as a valid full-scale score of 65. None of
the test results indicated malingering. Murphey also administered the Adaptive Behavior
Assessment System II (ABAS-II), an instrument for measuring adaptive functioning,
interviewing the applicant’s mother, sister, and one of his former teachers, and reviewing
additional information that four other respondents provided. The applicant’s ABAS scores
identified adaptive deficits in three areas: communication, functional academic skills, and
social skills. Even if the applicant manifested strengths in other areas of adaptive
functioning, Murphey explained, deficits in at least two of the areas identified in the DSM-IV-TR would support the conclusion that the applicant suffered from mental retardation.


 
Although there were no records of any I.Q. testing conducted before the applicant’s
eighteenth birthday, Murphey was able to extrapolate from grades and the affidavit of one
of the applicant’s teachers that onset of mild mental retardation occurred prior to that time. 
           Murphey acknowledged that, in 2008, Dr. Jesse Reed, III, tested the applicant’s I.Q.,
utilizing the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), and that the
applicant had obtained a full-scale I.Q. score of 79. But by that time the WAIS-III was
almost obsolete, only two months away from being replaced by the more “robust” WAIS-IV. 
Murphey also invoked the so-called “Flynn Effect,” which she described as “well established
in the scientific community as valid.”


 She believed that Reed should have waited to
evaluate the applicant with the WAIS-IV and that using the outdated WAIS-III instrument
had probably resulted in an “inflated” I.Q. score for the applicant in 2008.
           In addition, Murphey testified that:
•it is not possible to identify mild mental retardation by appearance.
 
•“Language and vocabulary is one of the best indicators of intelligence;
and so, sometimes there might be some hints [of mild mental
retardation], but you could not be sure.”
 
•people with mild mental retardation are capable of “masking” their
condition, particularly if they have adaptive strengths in some areas co-mingled with adaptive deficits in other areas.
 
•mild mental retardation is not associated with any particular personality
trait and can co-exist with antisocial personality disorder.
 
•“people, particularly with mild mental retardation, may function
perfectly fine in a world that’s familiar and routine and doesn’t require
high-level thinking and quick decision making, but in a more routine
kind of life.”
 
•people with mild mental retardation can often work adequately at
repetitive jobs, write letters, even successfully commit crimes.
 
•disciplinary problems in school could be a function of frustration borne
of progressively falling behind academically on account of mild mental
retardation.
 
•adaptive behavior on death row is not a good gauge of mild mental
retardation because life there is so regimented.

Murphey concluded that, based upon her testing, she believes that the applicant meets the
diagnostic criteria for mild mental retardation.
           The State countered with testimony from Dr. John Sparks, formerly a psychiatrist at
the Bexar County Jail, now retired. In 2000 or 2001, Sparks evaluated the applicant for his
competency to stand trial. Such an evaluation, he testified, would typically entail spending
half an hour to an hour with the inmate. Sparks had no independent recollection of his
interview with the applicant, but from the report he filed for the court he was able to say that
he had “seen no evidence that suggested [the applicant] was subaverage in his functioning.” 
Absent such a clinical impression during an examination for competency or sanity, Sparks
would not have ordered independent psychological testing for mental retardation. Although
he was familiar with the DSM-IV-TR criteria for mental retardation, Sparks admitted that he
had acquired no particularized training or broad experience over the course of his career in
diagnosing mental retardation, and that it was something he looked for only as it informed
his evaluations for competency or sanity. Indeed, from the witness stand, he could not even
recall what the third diagnostic criterion for mental retardation was. He nevertheless
confidently asserted that he “did not find any information that would warrant my saying [the
applicant] was retarded.” He had “not even considered [the applicant] to be potentially
retarded.” He could tell from his “personal evaluation” that the applicant was capable of
functioning at an average level and that no formal testing for mental retardation was
necessary. In conducting competency evaluations, Sparks used a written questionnaire that
was designed for subjects who function at a sixth-grade reading level. He evidently regarded
this as a sufficient protocol for rooting out mental retardation even though he acknowledged
that some people with mild mental retardation can read at a sixth grade level.
           In its proposed findings of fact and conclusions of law, the convicting court has
credited Sparks’s testimony over that of Murphey, recommending that we find that the
applicant has failed to establish mental retardation by a preponderance of the evidence
because of perceived flaws in Murphey’s evaluation.


 For example, with respect to her I.Q.
testing, “[s]he found no evidence that [the applicant] had tried to do less than his best work
on the I.Q. test, in spite of several factors that the DSM lists as suspicious.” Murphey indeed
acknowledged that death row was “a fairly stressful environment,” the implication being that
it is not a place that is conducive to optimal I.Q. test-taking. She also acknowledged that I.Q.
testing in the Atkins context can be problematic, since the test subject has a built-in motive
to malinger. But Murphey saw no indication that the applicant comprehended the legal
significance of the testing or that he was malingering.


 The convicting court also faults Murphey for “her extreme reluctance to admit that the term she used to describe the result
of [the applicant’s] earlier testing [by Reed] is not a clinical diagnosis to be found within the
DSM.” I frankly fail to see the impeaching significance of this observation.


 Murphey did
not deny that, in the abstract, an I.Q. score of 79 would fall within the range of borderline
intelligence rather than mild mental retardation. Her point was that, because of the Flynn
Effect, such a score on the WAIS-III, administered in 2008, should not necessarily be
regarded as sufficient to rule out a diagnosis of mild mental retardation. Any reluctance to
recognize that borderline intelligence is not a “clinical term” in contemplation of the DSM-IV-TR is inconsequential. Finally, twice in its recommended findings and conclusions the
convicting court observes that “even [Murphey’s] own testing showed [the applicant] to be
within the error range of not being mentally retarded.” The Court today rightly disowns this
observation in its order denying relief because it is simply inaccurate. A full-scale score of
65 falls squarely within the range for mild mental retardation even taking into account the
five point standard error measurement.



           The convicting court also criticizes Murphey’s conclusions with respect to the
applicant’s adaptive functioning. While acknowledging that it is best to obtain a broad range
of informants, Murphey herself managed to interview only three individuals, and two of
those were family members with a motive to help the applicant establish his Atkins claim. 
But in administering the ABAS, Murphey did not limit herself to the data obtained from her
interviews with the applicant’s family members; she also took into account the written
responses of other informants including a friend, a neighbor, a teacher, and a former
employer. In any event, it is hard to fathom why we should choose to discredit Murphey’s
conclusions as ill informed while at the same time accepting Sparks’s, when Sparks conceded
that he had interviewed nobody at all with respect to the applicant’s adaptive behavior,
choosing instead to rely on nothing more than his clinical judgment.
           The convicting court also impugns Murphey’s adaptive deficits conclusion because
she “was unwilling to credit evidence contrary to her conclusion.” It is true that Murphey
evinced some reluctance to accept certain adverse inferences that the State invited her to
draw during her cross-examination. For example, school records suggested that the applicant
had been placed in special education classes but did not reveal the reason why. The State
hypothesized that the applicant might have Antisocial Personality Disorder (ASPD), since
he was disruptive in class and failed to turn in his school assignments even though some of
his teachers believed he was capable of doing the work. Murphey conceded that the
applicant’s disciplinary record was consistent with ASPD, but insisted that such a diagnosis
would not rule out mental retardation. She was simply unwilling to speculate with respect
to the basis for the applicant’s placement in special education classes without information
about the actual standardized tests that would have been administered as part of that
placement, records of which had apparently been destroyed. She also acknowledged that
there was anecdotal testimony that suggested that the applicant has certain adaptive strengths. 
Given that adaptive strengths often coexist with adaptive deficits in people with mild mental
retardation, however, and that the diagnosis is still appropriate so long as there are sufficient
areas of adaptive deficiencies, it is not surprising that Murphey was unwilling to give
ground.



           Finally, in its concluding paragraph, the convicting court stated without elaboration
that, “[w]eighing the evidence against the Briseno factors, the Court finds that [the applicant]
did not meet the standard of proof to find that he is mentally retarded.” Only Murphey’s
testimony expressly addressed the so-called Briseno factors.


 She testified that “many” of
the applicant’s family members have regarded him as retarded, that the applicant is not a
“leader,” that he is not capable of complex planning or of constructing complex lies to cover
up his criminal activity, and that, while he can sometimes communicate coherently, “in some
areas, no.” Sparks did not address the Briseno factors at all.



           This is not meant to be an exhaustive summary of all of the evidence presented at the
post-conviction hearing. I think it is enough, however, to illustrate that the issue of mental
retardation, vel non, essentially boiled down to a battle between the two experts. The case
is indeed a “close question” in the sense that a rational fact-finder could choose, I suppose,
to discredit Murphey’s testimony and to rely instead on Sparks’s clinical judgment. And, in
an appellate context, I would be constrained to defer to the findings of the court below,
subject only to a review for evidentiary sufficiency.


 But in the ordinary post-conviction
habeas corpus context, we are not simply a reviewing court that is limited to reviewing the
rationality of the institutional fact finder in the court below. We are the court of return,
which means that we ourselves are the ultimate institutional fact finder. Nothing in the
record before us induces me to prefer the product of Sparks’s incidental mental retardation
evaluation over Murphey’s careful application of the appropriate diagnostic criteria as
measured by accepted diagnostic instruments. Giving credence to Murphey’s testimony, and
contrary to the convicting court’s recommendation, I would hold that the appellant has
demonstrated, at least by a preponderance of the evidence, that he is mildly mentally
retarded.
           But this subsequent habeas applicant must satisfy a higher burden. Because I cannot
say that he has shown by clear and convincing evidence that no rational fact-finder would fail
to find him mentally retarded, I agree that the applicant is not entitled to relief in this
subsequent writ application.



 
FILED:                    April 30, 2014
DO NOT PUBLISH